984

In re BUSH TERMINAL CO.

PERTH AMBOY DRY DOCK CO. et al. v. BUSH TERMINAL CO. et al.

Nos. 477, 478.

Circuit Court of Appeals, Second Circuit.

July 6, 1936.

Curtis, Mallet-Prevost, Colt & Mosle, of New York City (Creswell M. Micou, Eugene W. Goodwillie, and Clarence U. Carruth, Jr., all of New York City, and Kenneth N. LaVine, of Brooklyn, N. Y., of counsel), for appellant Bush Terminal Buildings Co.

White & Case, of New York City (Joseph A. Bennett, Alfred N. Heuston, and Thomas Kiernan, all of New York City, of counsel), for appellant Protective Committee for Preferred Stockholders of Bush Terminal Buildings Co.

David M. Palley, of New York City (Jesse Watson, of New York City, of counsel), for appellant J. S. Farlee & Co., Inc.

Lowell M. Birrell, of New York City (William H. Button and Charles A. Van Patten, both of New York City, of counsel), for appellee Bush Terminal Co.

Sullivan & Cromwell, of New York City, for appellees Committee Bondholders under the 5 per cent. consolidated mortgage of the Bush Terminal Co.

Gross & Keck, of Brooklyn, N. Y. (Fred L. Gross, of Brooklyn, N. Y., of counsel), for appellee Title Guarantee & Trust Co.

William M. Chadbourne, of New York City, for appellee Committee for Commercial Creditors of Bush Terminal Co.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On April 1, 1933, the Perth Amboy Dry Dock Company filed a creditors' bill against Bush Terminal Company and the usual consent receivership followed. On July 28, 1933, an order was made in that suit directing all creditors to present claims, and in accordance therewith the Bush Terminal Buildings Company, a subsidiary of the Terminal Company, the common stock of which was entirely owned by the latter, filed claims with the receivers. One claim amounted to $1,858,590.68, as shown by its books, and included in addition the further amount of $2,300,000 which had been eliminated on its books by a credit to the Terminal Company. This item of $2,300,000 was based upon an alleged transfer from the parent to the subsidiary of certain shares of stock belonging to the parent in English companies. No transfers had been made on the books of the English companies because the receivership intervened, but transfers had been voted by

the directors of the Terminal and the Buildings Companies, and the certificates had been delivered to the latter. By instructions of the court the receivers brought a suit to set aside the alleged transfers which, if successful, would increase the claim of the Building Company as it then stood on its books by $2,300,000, with appropriate adjustments of interest.

In addition to the foregoing disputed claims, there were claims filed by holders of the preferred stock of the Building Company which had been guaranteed as to payment of dividends by the Terminal Company. These unpaid dividends amounted to $1,592,500. The receivers filed a petition for instructions as to whether this claim should be allowed, but the matter was never disposed of or even brought to a hearing.

On November 17, 1934, the Terminal Company filed a petition for reorganization under section 77B of the Amended Bankruptcy Act (11 U.S.C.A. § 207). This petition was thereafter approved and trustees were appointed. Various plans for reorganization were proposed and referred to a master, who reported that the amended plan proposed by the Building Company, its preferred stockholders and the mortgage creditors of the debtor, was fair, provided that the intercompany debt of the Terminal Company to the Building Company was as stated on the books and the guaranty of dividends on the preferred stock of the Building Company was valid. Though the master made no finding as to the validity of those items, he held that there was question as to their validity. On the day when the master filed his report, the trustee of the debtor filed petitions objecting to the intercompany claim and to the claim of the preferred stockholders, and obtained an order to show cause why the claims should not be disallowed. Shortly thereafter the court filed a memorandum sua sponte, which stated in substance that, if no feasible plan should be presented within 30 days, the proceedings would be dismissed. On February 10, 1936, the debtor moved to dismiss both the section 77B proceeding and the suit in equity and to discharge the receivers and trustees. On February 21, 1936, a hearing was held, and the motion to dismiss the proceedings and to turn over the property to the debtor was granted. Meanwhile an agreement had been made between the debtor and the committee for the holders of bonds under the 5 per cent. consolidated mortgage of the Terminal Company and other creditors of that company to pay their claims after the dismissal of the proceedings had been accomplished as well as to pay certain fees and expenses of the first mortgage and consolidated mortgage bondholders. According to the brief submitted on behalf of the debtor, this only left a balance on hand in cash of about $600,000, which was subject to expenses incurred in connection with the reorganization and the receivership proceedings. In other words, this large corporation running with a close margin would be subject to immediate liabilities based on the intercompany indebtedness claimed to amount to $1,858,590.68, plus $2,300,000, or $4,158,590.68, exclusive of interest, and guaranteed dividends amounting to $1,592,500, making a total of $5,751,090.68, plus interest. The net earnings reported for 1935 were only $215,583.87, and this sum was arrived at without taking into account a claim of $490,000 for dividends guaranteed on the preferred stock of the Buildings Company. It is evident from the record that solvency even in a bankruptcy sense may well depend on the extent of the claims which are made by the Buildings Company and its preferred stockholders, and no finding of solvency was made by the trial court. Under such circumstances it seems clearly imprudent to return this company to the owner and to pay off general creditors while other claims amounting to $5,751,090.68 are in dispute. Indeed, full payment to the general creditors might result in an unlawful preference. On the other hand, it would seem reasonable for the District Court, if it is deemed practicable and wise, to pay off the arrears of interest to the consolidated mortgage bondholders who have a lien on the debtor's property.

As matters now stand, a plan has been submitted which has been recommended as feasible and fair if the conditions referred to by the master are met, and he has pointed out that information whereby the existence of these conditions may be actually determined can be obtained by having the claims tried out. We cannot say that there is not still a reasonable opportunity for the adoption of the plan proposed or some modification of it, provided the validity and extent of the disputed claims shall be ascertained. It seems wiser to proceed

to do that and to leave matters to be worked out under section 77B rather than to remit the parties to the equity suit where they would have to reorganize through the more difficult and complicated method of a judicial sale. Accordingly we think that the former method should be pursued and that a reorganization in a section 77B proceeding is by no means impossible. While an adjudication of the disputed claim will cause delay and the dismissal of the proceedings is certainly the most expeditious method by which the debtor can promptly resume business, a judicial ascertainment of these claims seems necessary in order to safeguard the interests of all concerned. Our decision of In re 235 West 46th Street Company, 74 F.(2d) 700, in no way precludes such a disposition.

Any compensation allowable in the equity receivership or in the reorganization proceeding brought under section 77B should, in our opinion, be fixed by the court and not be paid under agreements between the debtor and interested parties, as was to a large extent proposed.

The petition under section 77B was based on the allegation that the debtor "is unable to meet its debts as they mature." It is plain that the debtor could no longer meet its obligations in the usual course of business, were the disputed claims held valid and then enforced. Moreover, there may be some doubt whether the debtor is solvent in the bankruptcy sense. It depends largely on the validity and extent of the intercompany claim, the validity of the claims of the preferred stockholders, the worth of claims against subsidiaries, and the real market value of the fixed assets carried in the balance sheet at $17,383,676.31.

The orders directing that the proceedings in bankruptcy and equity be dismissed and the property turned over to the debtor, subject to the fixing of compensation, should be reversed, and the proceedings should be remanded, with instructions to adjudicate appellants' claims, to consider thereafter, on the merits, the plan of reorganization proposed by appellants, as well as any amended or further plan that may be presented within such time as the court may deem reasonable, and, if no such plan be adopted, then to dispose of the property of the debtor, or the proceeds thereof, in such way as will adequately protect all creditors, either by liquidation in bankruptcy or by reorganization in the equity suit, or, in the event that the claims of creditors are satisfied, by turning over the property to the defendant after dismissing all proceedings on proper terms.

Orders reversed.